# CHARLESTON.

JOHN DUNDAS FLAVELLE et al. v. RED JACKET CONSOLIDATED
COAL & COKE COMPANY et al.

Submitted March 5, 1918.    Decided April 16, 1918.

1.  ARBITRATION AND AWARD—*Condition Precedent.*

A provision in a contract that certain differences arising under
it shall be submitted to arbitrators, thereafter to be chosen, will
not prevent a party from maintaining a suit, in the first instance,
to enforce his rights under it, except where an award is made a
condition precedent to the right to sue, either by express provision
contained in the contract or by one necessarily implied from its
terms.    (p. 299).

2.  SAME—*Action on Lease.*

A provision in a coal lease merely requiring the parties in case
of disagreement to submit to arbitrators, thereafter to be chosen,
the question whether the lessee has left standing in any room,
working or other opening in the mine available and merchantable
coal which is not necessary to be left for the proper security of
the works, does not alone create a condition precedent to the
right of the lessor to sue in the first instance.    (p. 301).

3.  MINES AND MINERALS—*Coal Leases— Grades of Coal.*

Where the lessor in a coal lease reserves the right to inspect
the mining operations and for a period of several years is fre-
quently, often daily, present either in person or by agent while
operations are in progress, and presumably is familiar with the
screens used to separate the low from the high quality coal, he
cannot later be heard to complain that coal sold by the lessee as
"slack" and accounted for as such was in fact coal of a higher
quality and should have been accounted for at the rate stipulated
for such grade.    (p. 303).

4.  SAME.

In determining what coal is not within the meaning of the
terms of a lease requiring the lessee to mine all available, work-
able and merchantable coal, important elements are its location
and condition in the mine and the disproportionate difference be-
tween the cost of operation therefor and the profits to be derived
therefrom if mined and sold.    If the difference is such as to
deter an ordinarily prudent and practical operator from mining
it, such coal is not within the meaning of such descriptive terms.
(p. 308).

5.  SAME—*Coal Lease—Royalties.*

Where a coal lease requires payment of an annual minimum roy-

alty ''whether the quantity of coal mined and coke manufactured shall produce that amount of royalty or not,'' and the lessee ceased mining operations on the land, with notice thereof to the lessors, within any royalty period without having mined therein coal sufficient to yield such royalty, though he left unmined coal which the contract required him to mine, he is chargeable with such share of the royalty as had accrued at the time of the notice, less the value of the coal mined during such period at the agreed rate per ton. (p. 309).

Appeal from Circuit Court, Mingo County.

Suit by John Dundas Flavelle and others against the Red Jacket Consolidated Coal & Coke Company and others. Decree for plaintiffs, and the named defendant appeals.

*Modified and affirmed.*

*Goodykoontz & Scherr,* and *Greever, Gillespie & Divine,* for appellant.

*Campbell, Brown & Davis,* and *Wiles & Bias,* for appellees.

LYNCH, JUDGE:

Plaintiffs owned two tracts of land in Mingo County containing several seams of coal deposits, one of which known as the Upper Seam they leased to W. R. Hughes and Joseph S. Lipton November 1, 1897, ''for coal mining and coal coking purposes only'' for a period of twenty-seven years, or until all the workable coal of that seam is mined and removed from the leased premises. For the coal so mined and removed the lessees contracted to pay the lessors quarterly nine cents a ton of 2240 pounds, and for ''slack'' coal five cents a ton in the event only that the lessees find a market therefor, and any coal mined and used upon the premises by the lessees or furnished by them to their employes and not weighed, to be accounted for and paid for at the same time at ninety cents for every one thousand tons of coal mined during the three calendar months preceding the said quarterly payments.

The rights conferred by the lease passed by mesne assignments to the defendant and appellant, Red Jacket Consolidated Coal & Coke Company, June 21, 1904, and it assumed the obligations imposed by the lease upon the original lessees,

Hughes and Lipton, and thereafter went upon the land and began to prepare for mining operations thereon, and when these were completed also entered actively upon the performance of the lease covenants, which being performed fully, as it claims, appellant proposed to retire from and abandon the premises and of that purpose notified the lessors by letter dated July 30, 1912, to which notification the lessors through C. B. Taylor, agent for himself and co-plaintiffs, replied August 6, 1912, and after acknowledging the receipt of the letter used this language: "Our engineers report to us that you have left at least 50,000 tons of available, merchantable coal standing which ought to be mined and taken away, and I do now, on behalf of myself and my co-lessors, demand that you at once proceed to mine and take away said coal according to the directions and provisions of said lease, and I do hereby notify you that if the work of mining said coal is not commenced within one week after receipt of this letter, which you are to take in lieu of the formal notice provided by the clause of said lease above quoted, I shall demand that the matter be arbitrated, as in said lease provided."

Disregarding the demand to proceed with mining operations for the removal of the residue of the seam of coal leased and the invocation of the arbitration provision of the lease, the appellant did not resume mining operations but abandoned the enterprise. The lessors then brought this suit and obtained a decree ascertaining 200,318 tons of the leased seam as the quantity of coal remaining unmined and unremoved therefrom, though minable, available and marketable according to the requirements of the lease; fixing the value thereof at $18,028.62, computing the tonnage at the greater rate stipulated in the lease; apportioning the amount among the lessors pursuant to an agreement among them, $6,760.73 to John Dundas Flavelle and Mary Ann Flavelle, and $11,-267.89 to R. N. Taylor, administrator of Charles B. Taylor, deceased, and Barbara J. Taylor; and the operating lessee has appealed.

A preliminary question, one that strikes at the very foundation of the right of the plaintiffs to maintain the suit, is presented. It involves that provision of the contract whereby

they promised and agreed to provide and furnish the lessees
with an accurate map or plat based upon an actual survey of
the tract and showing its corners and the calls of the deed to
enable them to avoid encroaching upon the coal of the same
seam within adjacent tracts, and with greater caution and
facility to effectuate their mining operations, and concluding
with the express declaration: ''And no forfeiture or penalty
shall be incurred (by the lessees) under the provisions of
this lease, unless the lessors furnish said map and description
of said lands above specified.''

With this requirement, it is said, the lessors made no at-
tempt to comply; but, so far as we can discover from the
voluminous record, the lessees did not at any time during
the mining operations conducted by them on the leased prem-
ises demand such survey and map. There was of course no
real necessity for such demand since the contract does not re-
quire it, but if the survey and map were indispensable to the
proper mining of the coal or to enable them to guard against
the danger of incurring the statutory penalty for mining
coal within the boundary area forbidden by statute, and pro-
tection seems to have been the real reason for the require-
ment, such a demand, though not expressly required, would
doubtless have been heeded and the map produced. At least,
compliance therewith would have aided the lessees to avoid
encroachments upon the rights of coal owners and operators
of the same seam on adjacent lands and also to prevent a
violation of the express mandate of the statute. But whether
the survey was or was not made or the map or plat furnished,
no proof shows with certainty. The original brief of the ap-
pellant does not point to any positive testimony upon that
subject, as our rules necessitate, nor does the reply brief re-
spond to that of the appellees wherein it calls attention to
the inconclusive nature of the testimony introduced by the ap-
pellant to show failure to furnish these papers. The testi-
mony is only that the witnesses do not remember seeing them.
Nor is there any serious attempt to show such failure, and the
entire eight or nine years of active mining operations con-
tinued without their production, if indeed neither was fur-
nished, and during that time no complaint was made that this

requirement was disregarded until this controversy arose. Besides, as appellees contend, their failure ought not now to be permitted to excuse performance of the obligation assumed by the appellant to mine and remove all the available, workable, minable and merchantable coal of the upper seam contained within the leased premises, if it be true that appellant has left unmined large areas of coal identifiable by these descriptive terms. It prosecuted the work it engaged to do just as if the map were spread out before it; nor was it necessary in the prosecution of the work except as the operations approached the statutory five-foot boundary lines of the tract, within which coal could not lawfully be mined by any operator. The only apparent injury that resulted from the omission was a negligent encroachment upon adjacent coal lands during these operations.

The next three assignments for convenience are considered and determined together since they involve the same clause of the lease, the clause that provides for notice and arbitration. After the covenant and agreement of the lessees to work the mine and mine the coal according to the most approved and suitable methods of modern mining and to submit for approval as soon as practical to Charles B. Taylor, one of the lessors, he being also experienced in such operations, or to some other competent mining engineer to be named by the lessors in his stead, a proposed method or system of operating for the coal upon the leased premises, and after the provision respecting any disagreement between the lessees and such agent upon the whole or any part of such plan, the clause requires both parties to the lease forthwith to submit their differences to arbitrators to be constituted in the manner therein prescribed, who shall "determine and report upon all matters in dispute between the lessors and lessees with reference to said method of mining." Coupled with this clause and as part of the same paragraph is this further provision: "And if the lessees upon abandoning any room, working or other opening shall leave any available coal standing which in the opinion of the said officer of the lessors is not necessary to be left for the proper security of the works, the said officer shall give the lessees notice thereof with directions to remove the

same, and if the said lessees shall refuse to mine and take away the said coal according to the directions of the said officer for the space of one week after such notice, the said officer and the lessees shall forthwith submit the question whether the coal left is or is not necessary as aforesaid," the arbitartors to be selected in the same manner and "to determine and report whether any and if any how much available and merchantable coal (is) left standing which ought to be mined and taken away and unless the lessees shall mine the said coal, it (they) shall pay to the said lessors within ninety (90) days after said report, nine (9) cents for every ton of twenty-two hundred and forty (2240) pounds of the available and merchantable coal left standing according to the report of said arbitrators (which) ought to have (been) mined and taken away."

The parties obviously did not intend to give to either of these requirements a conclusive effect upon all the provisions of the contract, although it seems they did intend to make the report of the arbitrators final and conclusive upon the necessity of leaving unmined any available and merchantable coal when the operator is about to abandon or has abandoned a room, working or other opening presumably for the purpose of removing operations to some other part of the mine. In this respect the arbitration is a condition precedent to the right to maintain and prosecute an action or suit to recover compensation for any merchantable and available coal left unmined that could or ought to have been mined before abandoning such room, working or other opening. But we find no declaration of an intention to apply the same provision to operations of the mine as a whole or any part of it other than that so definitely prescribed. And there is no other provision to that effect except as to the survey and map. Nor so far as we can perceive is there any express provision prescribing penalties or forfeitures except the one which avoids the lease if the lessees do not promptly begin the development of the property. · But with these and every other provision of the lease the operating lessee has fully complied, at least no failure on its part is alleged or insisted upon save and except its failure to keep and perform the

agreement to mine and remove or account for all available, workable, minable and merchantable coal within the upper seam on the leased premises.

The necessity for an express declaration in a contract of an intention to submit matters of difference to the award of arbitrators as a condition precedent to the right to resort to the courts for redress is doubted in many jurisdictions; and according to many obiter expressions of judicial opinion, courts should encourage rather than discourage submission of controversies to the arbitrament of a tribunal specially constituted by the parties to adjust their differences. But, ordinarily, the courts will not hold valid and binding and in bar of a suit an agreement requiring arbitration, except where there is an express declaration or a necessary implication to that effect. Judge Coleridge, though criticising the doctrine as standing on no solid reason, admits it to have been recognized so generally and acted upon so frequently as to require continued adherence to it. *Scott* v. *Avery,* 8 Exch. Div. 497, 36 Eng. Law & Eq. 1. So do *Condon* v. *Railroad Co.,* 14 Gratt. 302, 313; *Kinney* v. *B. & O. Relief Ass'n,* 35 W. Va. 385; *Asphalt Refining Co.* v. *Trinidad Lake P. Co.,* 222 Fed. 1006. In the case last cited, Judge Hough restates and declares unsound the factors usually assigned as the bases of the conclusion reached in England in early judicial decisions and since followed in the United States as the general rule upon the subject. His criticism is forceful and illuminative; yet he felt constrained to act upon and hold in accord with that rule, notwithstanding the criticism. For the variant applications of the rule see also an exhaustive and interesting note to *Williams* v. *Branning Mfg. Co.,* 47 L. R. A. (N. S.) 337-448.

Where a contract manifests an intention of the parties to give to an award of arbitrators finality upon the question of the amount to be paid for a breach of some of its provisions but not to grant to the arbitrators or their award a conclusive effect in the determination of a general liability, there can be no question of the validity of the provision. If the contract contains the further provision in reference to such submission and an award of the arbitrators that it shall be final as to the

amount and that no action or suit shall be maintained until after such an award is returned, the award is a condition precedent of the right to sue. However, in the absence of such a provision, either expressed in the contract or necessarily implied from its terms, the agreement for the submission of the amount to arbitration is collateral and independent, the authorities say, and also, while a breach of the agreement will support a separate action, it cannot be pleaded in bar to an action upon the principal contract. *Hamilton* v. *Home Ins. Co.*, 137 U. S. 370, 385; *Reed* v. *Washington Ins. Co.*, 138 Mass. 572; *Seward* v. *Rochester*, 109 N. Y. 164; *Birmingham Ins. Co.* v. *Pulver*, 126 Ill. 329, 338; *Chadwick* v. *Phoenix Accident & Sick Benefit Ass'n*, 143 Mich. 481. Moreover, generally speaking nothing can be determined by an award except the exact question agreed to be submitted for arbitration. *Platt* v. *Aetna Ins. Co.*, 153 Ill. 113.

Upon this subject our decisions accord with the doctrine so declared and sustained by the weight of authority. *Kinney* v. *Relief Ass'n*, 35 W. Va. 385; *Lawson* v. *Williamson Coal Co.*, 61 W. Va. 669, 681; *Moore* v. *Gas Co.*, 76 W. Va. 649, 654. Point one of the syllabus in the Kinney case is: ''A provision in a contract that all differences arising under it shall be submitted to arbitrators, thereafter to be chosen, will not prevent a party from maintaining a suit, in the first instance, in a court to enforce his rights under it.'' The provision with which we are here concerned does not either in express terms or by necessary implication make the submission to arbitration a condition precedent to the right to sue. It does not limit the amount of recovery in the courts to the arbitrators' finding as to the tonnage of coal unmined which should have been mined, from which a condition precedent might necessarily be inferred or implied.

Embraced within these assignments also is that provision already referred to which relates to the abandonment of any room, working or other opening wherein was left standing any workable and available coal which in the opinion of the lessors should have been removed by the lessee. This submission evidently was limited exclusively to this stipulation of the parties. To apply it to any other departures from the re-

quirements of the lease would give it force and effect which, judged by the contract, the parties did not intend it to have.

Apparently, counsel for appellant do not propose to enlarge the scope of the arbitration covenant beyond the apparent purpose of the provision, but to confine it wholly to the accomplishment of its immediate purpose, namely, of determining, first, whether the operating lessee had abandoned any room, working or other opening without having mined and removed all available, workable and merchantable coal from such part, and second, if so, the amount thereof to serve as the basis of a settlement between them, should the lessee decide not to mine what remained unmined therein; and of the recovery to which the plaintiffs may appear to be entitled on that account, but as to which the appellant denies the right of the appellees to recover anything since they did not invoke the aid of this provision at the time contemplated by the agreement.

The contract terms gave the lessors ample opportunity to keep in intimate touch with the prosecution of the work done in the mine and advised of the progress made in the operations therein; indeed, for a modified form of superintendence on their part for their own protection. They saved to themselves that privilege, under the authority of which Taylor did frequently, often daily, inspect the mine. He saw and knew what was being done and accomplished therein as the work progressed. His access thereto was not restricted, and when because of illness he could not personally perform that duty, he sent an agent to represent him and his co-lessors. Having the authority and opportunity, and using both, to know what was being done or omitted that the lease required and whether the lessee had abandoned any place of work in the mine before all the workable and available coal was removed from such part, the legal inference is that the lessors had knowledge of the abandonment when it occurred. If they did not use this privilege reserved by them for that purpose, they cannot now complain of the omission or excuse demand for the removal of the coal from such places or for a submission to arbitration as required by the lease. But no proof warrants the conclusion that any coal was suffered so to re-

main after such places were abandoned and the mining instrumentalities moved elsewhere in the mine, if such were the fact; and hence there is no basis for computing either the amount or value of the coal, if any was so lost.

The coal left unmined which the contract required the lessee to mine and market the decree ascertained to be 200,318 tons, and upon this quantity based the recovery which it awarded to the plaintiffs. The method by which this result was reached was to assume as correct the estimates and computations made by the witness Goode who used a planimeter for the purpose, and from these estimates deduct the coal included within designated areas, which, as the judge of the circuit court thought, was not such as came within the meaning of the descriptive terms used in the contract. For the purpose of such ascertainment Goode inspected the mine November 1, 1908, and as of that date found a large unmined tonnage of available, workable and merchantable coal in the mine. This total the court adopted as the basis of its calculation of the quantity with which to charge the lessee and from it deducted the tonnage thereafter mined and accounted for as well as the tonnage contained within certain excluded areas on the ground that the coal therein was not such as the contract contemplated. These areas are designated as sections "A", "B", "C", "D", "not drawn yet", "low coal area No. 1", "low coal area No. 2", "five foot boundary strip", "Thacker Squeeze" and the "area between the supposed and corrected boundary lines". From the quantity so ascertained, the court allowed a further deduction of fifteen per centum, the estimated loss sustained in mining operations, and using the result so obtained and the nine-cent rate prescribed by the contract found the balance decreed against the lessee.

That the estimates so made more than three and a half years before the lessee gave the lessors notice of the previous cessation of the mining operations, the appellant contends, and Goode virtually so admits, are not wholly accurate. He did not then go into the mine to qualify himself to testify in this suit, it was not contemplated at that time, but as to another matter in which appellant had no interest. It involved the value of the property rights or estate of C. B. Taylor upon

the question of his solvency. Admittedly, the examination was cursory and incomplete, doubtless because of the physical condition of the mine at that time; its partial inaccessibility. The lessee mined and accounted for nearly two-fifths of a millions tons of coal thereafter and before abandoning the property. As one factor of his computation, he used six feet as the height of the coal seam in the entire mine, when it clearly appears and is not controverted that much of the seam is less than four feet, some, indeed, less than three feet thick. There is no pretense that the estimates are other than approximately correct. Strict accuracy seems not to have been the aim and that result was not attained if the testimony of other witnesses whose opportunity to see and know was greater then Goode's is entitled to credit and weight in determining the actual or approximate quantity of workable and merchantable coal remaining in the mine when the lessee abandoned the property. These witnesses whose testimony is contradicted only indirectly, not expressly or positively, and whose veracity is unimpeached were at various times superintendents of the lessee covering the entire period of the mining operations. They agree in saying that all the coal the lease required to be mined was taken out as the work progressed and before the mine was abandoned and none was left except what was not within the meaning of the descriptive terms used by the parties, such as coal contained within certain specified areas deducted, the propriety of the exclusion of which we do not question. Upon what authority can the testimony of these competent and unimpeached witnesses wholly be disregarded? It is true the decree is predicated upon conflicting testimony; but the conflict is partial, not complete. In most respects there is no substantial disagreement between the witnesses who testify upon the general subject of the appellant's omission to effectuate fully the provisions of the contract; wherefore the case is not controlled by our decisions which agree in holding that a decree will not be disturbed where the conflict is such that different judicial minds might reasonably disagree as to the proper deductions from the facts proved. 1 Enc. Dig. 620, section 2.

Speaking of, though perhaps more particularly intending

to refer to, the interior of the mine, Wilson, Lambert, Williams, Sluss, Thomason and several other witnesses say that no available, minable and merchantable coal was left in the mine when work therein ceased.   As to this fact there is scarcely any material contradictory testimony save Goode's. What Watt Stevens said was quite general and inconclusive, indeed upon the main issues it was confirmatory rather than contradictory.   Apart from what Goode saw in 1908, his testimony and that of Gaujot and Breece and one or two others was confined to an examination made by them at or near the pit mouth or mine opening, and then only for evidentiary purposes.

Wilson does admit the loss of some five or six pillars of coal, part if not all of which were measured by Goode upon his 1908 examination, the dimensions of which as estimated by Wilson were fifty by ninety feet each.   That loss was due, he says, to the Thacker Squeeze.   Neither he nor Goode knew or estimated the exact quantity of coal therein, though either of them could readily have done so.   Another reason assigned by Wilson for not mining these pillars is their location in a low part of the mine which was "full of water all the time and made it impossible to mine it (the coal) and handle that water," and that besides these pillars there was no coal left other than in low coal sections "1" and "2," which he also says was not minable.   He does, however, admit the water could have been drained by means of a high-powered pump, the cost of installing which would vastly exceed any possible value the coal would have had if it were mined.

It is true he also concedes the correctness of Goode's measurements of some coal areas in a part of the mine, but there is lack of specification as to the quantity of such coal. Whatever amount Goode found at that point he included in the gross tonnage reported to Taylor without specifying the items composing it.   In other words, he does not speak of the several items of his computation or particularize them.   He limited his explanations to the process used in ascertaining what he thought was minable and unmined at that time and the aggregate of the entire tonnage.   Nor, so far as we have

discovered, does any other witness itemize his finding. They speak generally as to the whole mine, not definitely as to any particular department of it.

It is as impossible as it is unnecessary to give a detailed review or summary of the testimony as a whole or of that of each of the numerous witnesses whose depositions were taken and filed in the cause.    Such labor would serve no useful purpose.    What has been said, however, will suffice to show the unreliability of Goode's first estimates.    For, though when made they may have been accurate in every particular, the changed mine conditions deprived them of their real value as proof when offered.    So that when considered in view of the duty which legally. devolved upon the appellees, when they brought this suit, to prove the facts alleged in their bill, and further, in view of the express requirements of the lease to which we have referred, these estimates seem to be not conclusive upon the merits.    For, if that for which they now contend be conceded to be true, namely, that as the mining operations progressed from time to time or from year to year or for other different periods the lessee left unmined such coal as the lease required to be mined, the contract itself made ample provision and gave unrestricted opportunity to them to ascertain that fact and by pursuing the method prescribed to correct the default with the necessary promptitude.    By resorting thereto they could have required such coal to be mined at that time.    Goode reported the result of his investigation to Taylor early in November, and, according to the uncontradicted testimony of a witness then present, he informed Taylor that operations throughout the mine were pro-gressing satisfactorily; or to be more explicit, that the lessee was extracting all the coal in the seam the contract required to be taken out.    This statement Goode does not deny, nor does any other witness.    He does, however, frankly admit that the map he had with him when he inspected the mine at the instance of Taylor, and for which Taylor furnished him with the map, indicated in 1908 that the lessee then was endeavoring to mine all the coal in the mine.    If Goode inadvertently misled Taylor, the lessee is not chargeable with the consequences, if indeed that opinion was erroneous.

The identification and accuracy of the map are questioned also by the appellant but without just cause as to the former. It was a map showing the result of the mining operations, the pillars left standing and the coal areas exhausted; but its accuracy is doubtful. For it seems sufficiently clear that it was not checked to that date and hence was incomplete as regards the part of the 'work theretofore done in the mine.

To the action of the court whereby there was excluded from the computation the various designated coal areas the appellees protest and object, but without sufficient reason according to our conception of the merits of the objection. Some of the areas affected contained coal that was not and could not be mined and marketed except by the expenditure of money greatly disproportionate to the profits that might be realized from a sale thereof; nor can it reasonably be said that the parties to the contract contemplated such disastrous conse- quences to operations under the lease. Coal not available and not merchantable is not within the terms used to define what shall be mined. There is much positive proof showing the unavailability of the coal within these areas and its un- merchantable character and the unworkable conditions sur- rounding it and that the greatest possible yield from it if mined and cleaned to put it into a marketable condition, should there be a demand for it, compared with the expense of the necessary process, would deter any reasonably cautious or prudent operator from engaging in such an unpromising adventure.

Plaintiffs' claim for relief is founded in part upon sales of slack coal, when, they charge, it was not slack but merchant- able coal of a higher grade, and for which they assert the right to compensation at nine cents a ton instead of the price stipulated for slack. This claim the decree refused to allow for the reason stated in the opinion of the judge who decided the case on the circuit, an opinion in which we concur, that Taylor as the representative of himself and co-lessors saw and knew the quality and quantity of the coal shipped and sold by the lessee as and for slack. He saw or had the opportunity to see, and it was his duty to known and presumably he was familiar with the screens used to separate the low from the

high quality of coal during the more than eight years of the lessee's operation and management of the 'mine. Besides, the lessors received the minimum compensation for coal mined and shipped as slack without protest or complaint. Having failed to protest when duty required, they cannot now be heard to demand amends for that in which they so long virtually acquiesced.

The only proof which, in our opinion, according to the express provisions of the contract when properly construed, tends with reasonable certainty to establish the claim of the appellees for coal lost, the loss whereof was not due as much to their negligence as to the negligence of the operator, is the testimony of Goode, Gaujot and Breece pertaining to coal located by them after this suit was brought at or near one of the mine openings, which they say was accessible and merchantable. This testimony stands without substantial contradiction, if contradicted at all, although they do not agree as to the quantity so left. This difference may be accounted for by the failure to measure all of it. They estimated the part not measured. Comparing the discrepancies and making due allowance for errors of judgment, the tonnage probably did not exceed 50,000, which, when reduced by the mining loss percentage, will at the stipulated tonnage rate yield $3,825.00 as the amount of compensation to be rendered the appellees for coal actually lost.

Appellees also cross-assign as erroneous and therefore prejudicial to their rights under the contract disallowance by the decree of their claim for the annual royalty due under the terms of the contract. This the lessee agreed to pay during the twenty-seven year term unless all the coal of the kind and quality described was mined before the expiration of that period, and also unless the compensation to be paid on the tonnage mined each year exceeded the amount of such royalty. The period covered by the royalty claim is from November 1, 1911, to June 25, 1913, the first date being the beginning of a current year within such term, the second, the date of the institution of this suit. The appellant does not pretend to have mined the minimum amount necessary to extinguish the royalty demand after November 1, 1911, and

does not attempt to excuse itself for not doing so except upon the theory that it had wholly kept and performed the several covenants of the contract. That contention, however, is not based in part at least upon solid ground.

No way of escaping the royalty payment seems to be open or available, for if a lessee covenants to mine a certain quantity of mineral during a fixed period of time or to pay a definite rental or royalty in the event he fails to do so and he is not exonerated therefrom by some other stipulation of the contract, he will generally be held to a strict performance of the covenant. So that if ore in the mine is not exhausted and the lessee has not mined the prescribed quantity, generally "he will be held for the payment of rent and royalty the same as if it had been taken out, this being regarded as equivalent to stipulated damages, which may not be reduced by evidence of the actual value of the mineral, and this, whether or not there is an express covenant to pay royalty on a minimum amount." 1 Barringer & Adams, Mines & Mining, 108; *Lawson* v. *Williamson Coal & Coke Co.,* 61 W. Va. 669.

It seems fair and reasonable to assume an intention on the part of the lesssee to act in good faith and in an honest endeavor, as Goode says it did, to mine all the coal it contracted to mine and so presumably thought it had mined when it abandoned the property and gave the notice of July 30, 1912, and we are of the opinion that justly and equitably the royalty claim should not be allowed beyond that date, which, when ascertained and subjected to credit for 16,844 tons mined since November 1, 1911, at nine cents a ton for run-of-mine coal and five cents a ton for slack, the total credit being $1263.67, leaves a net royalty claim of $2111.33. This combined with the compensation fixed for coal left unmined aggregates $5,936.33 as the sum for which the plaintiffs are entitled to a decree, the amount to be apportioned between them as they have agreed, 62½ per cent in equal parts to R. N. Taylor, administrator of C. B. Taylor, deceased, and Barbara Taylor, and 37½ per cent in equal parts to John Dundas Flavelle and Mary Ann Flavelle, with interest from the date of the decree appealed from, and to this extent that decree

is modified and, as so modified, affirmed, with the usual costs, etc. to appellant, it having substantially prevailed.

*Modified and affirmed.*