# CHARLESTON.

JOHN E. C. KOHLSAAT *et als.*, TRUSTEES, ETC., *v.* MAIN ISLAND CREEK COAL CO.

Submitted February 28, 1922. Decided March 7, 1922.

1.  ARBITRATION AND AWARD—*Provision That Parties to Lease for Coal Mining Purposes Will Submit Controversy to Arbitrators Will Not Prevent Suit by Either Party for Asserting Rights Under It.*

    A provision in a lease of land for coal mining purposes providing that any controversy between the lessors and lessee, arising thereunder, shall be submitted to arbitrators and to an umpire in case of disagreement, and designating how the

arbitrators and umpire shall be selected, will not prevent either party from maintaing suit to assert his rights under it. (p. 662).

2. SAME—*Arbitration Clause in Coal Lease for Mining on Royalty Basis Will not Prevent a Revocation of Agreement to Arbitrate or a Resort to Courts for Adjudication of Rights.*

Provision in an arbitration clause in a lease of land for mining coal on a royalty to the lessor, that upon failure of either party to appoint an arbitrator the other may make an appointment of two arbitrators, and the two so appointed may select an umpire, does not prevent a revocation of the agreement for arbitration, nor prevent a resort to the courts in the first instance for a vindication of rights under the lease. (p. 663).

3. MINES AND MINERALS—*Lease—Construction—Royalties.*

Where a lease of land for mining coal stipulates that a fixed sum for each ton of coal mined shall be paid the lessor as royalty, but if the coal is sold to the consumer for a price above ninety cents per ton then the lessee shall pay, in addition to the fixed sum, ten per cent of the price in excess of ninety cents; and the lessee increases its price to consumers by the addition of 45 cents per ton under a permissive order of the Federal Fuel Administrator, which order allows such increase on condition that a corresponding increase per ton be added to wages of lessee's miners, and the lessee sells its coal to the consumer at $2.50 per ton, and increases the wages of its miners in accordance with the condition of the permissive order, the lessee, in computing royalties to be paid to its lessor, is not permitted to first deduct the 45 cents from the price of the coal sold to the consumer and calculate the excess royalty on the remainder left above 90 cents per ton. The lessor is entitled to receive royalties based on the full price paid by the consumer. (p. 664).

4. SAME—*Lease Construed to Inhibit the Expense of Selling Coal to be Deducted from the Sale Price Before Computing Royalties.*

Where there is a provision in a coal mining lease that royalties shall be paid the lessor on a basis of the price at which the coal is sold to the consumer, the lessee is not justified, in computing the royalty, to subtract commissions paid to a selling agent from the sale price of its coal, and calculate the royalty on the sum remaining. The expense of selling the coal is an ordinary and necessary expense of the operation, and should not be deducted from the sale price before computing royalties. (p. 668).

90 W. Va.

5.  ACCORD AND SATISFACTION—*Liquidated Damages—Payment of Less Than Sum Due Not a Satisfaction of the Debt if There be no Release Under Seal or New Consideration as to Part Unpaid.*

    "Payment by a debtor and receipt by a creditor of a less sum than is due upon an undisputed liquidated demand is not satisfaction of the debt, although the creditor agrees to accept it as such, if there be no release under seal or no new consideration given as to the part left unpaid." (*Nixon* v. *Kiddy*, 66 W. Va. 355.)  (p. 669).

6.  SETTLEMENT—MISTAKE.

    Any item omitted by reason of mistake or inadvertence from a stated and settled account, growing out of ordinary business transactions, may be recovered in an appropriate legal action.  (p. 771).

Error to Circuit Court, Logan County.

Action by Jonh E. C. Kohlsaat and others, trustees, etc., against the Main Island Creek Coal Company, and from a judgment therein the plaintiffs bring error, and the defendant assigns cross-error,.

*Modified and affirmed.*

*Fitzpatrick, Campbell, Brown & Davis, Brown, Jackson & Knight,* and *R. D. Campbell,* for plaintiffs in error.

*E. L. Hogsett.* and *Holt, Duncan & Holt,* for defendant in error.

LIVELY, JUDGE:.

This litigation arises out of a coal mining lease executed by Clinton Crane and James O. Cole to the Main Island Creek Coal Company on about 27,000 acres of coal lands in Logan County, dated October 6, 1913.

The issues involved arise under the provision of the lease relating to royalties, and that relating to arbitration of controversies which might arise.

The royalty provision is: "And the said lessee, in consideration of the premises, does covenant and agree to commence at once upon delivery of this lease, the work of developing said lands as a coal producing property, and to prosecute the same continuously and with diligence; and further covenants and agrees, during the term aforesaid, unless this

lease shall be sooner terminated under some provision hereof, and in such case until such termination, to pay to the lessors the rents and royalties for the use of said demised premises and said coal; that is to say, ten (10) cents per ton for every ton of two thousand (2,000) pounds, and, in addition thereto, ten (10) per cent. of the selling price of said coal above ninety (90) cents per ton F. O. B. cars at the tipples. The lessors are to be paid never less than ten (10) cents per ton of two thousand (2,000) pounds, and whenever the coal from said premises shall sell to consumers for a price above ninety (90) cents per ton of two thousand (2,000) pounds at the tipple on an average of all grades, then, and in every such case, the lessee shall pay to the lessors ten (10) per cent. of the price in excess of ninety (90) cents.

"Each calendar year of the lease shall be divided into two equal periods, and all coal mined and sold during each period, and the aggregate sum for which it was sold to consumers shall be ascertained, and, if it appear that the coal mined during such periods sold for a sum in excess of ninety (90) cents per ton of two thousand (2,000) pounds, then, and in such event, ten (10) per centum of such excess above ninety (90) cents per ton shall be paid to the lessors in addition to the ten (10) cents per ton aforesaid. Coal used on the premises shall be accounted for at the average price per ton for which the coal mined during such period sold."

The arbitration clause reads: "It is further agreed that in case of any controversy between the lessors and lessee, arising under this lease, the same shall be submitted to arbitrators and to an umpire in case of a disagreement, which arbitrators shall be selected in the following manner:

"The party desiring arbitration shall nominate one arbitrator, and shall notify the other party of such nomination, and the other party shall, within ten (10) days after receiving such notice, nominate an arbitrator and the two before proceeding to act shall select a third party to act jointly with them. If such other party fail and neglect in the time aforesaid to nominate an arbitrator, then the party desiring arbitration shall nominate two such arbitrators, and the two so nominated shall elect the umpire aforesaid. After the said

arbitrators shall have been so selected, the third person selected as umpire shall fix a time and place for the purpose of meeting and hearing the parties and any evidence they may submit, and the decision of said arbitrators or any two of them in writing shall be binding upon the parties. Said arbitrators shall, after hearing the parties and any evidence that they may submit, make up their award and reduce the same to writing, and seal the same and deliver to the lessors one copy thereof and to the lessee one copy thereof.

"The expense of the arbitrators shall be paid accordingly as the arbitrators shall provide in their award. The persons to be selected as arbitrators and umpire shall be persons of experience in the coal mining business, and shall be men of character, intelligence and standing, in no way related to either party or interested with lessors or lessee."

In 1916 Cole and Crane conveyed the land leased to plaintiffs as trustees of the Cole and Crane Real Estate Trust, to become effective upon the death of either of the grantors, and, Crane having died in 1917, the trust became effective. In the summer and fall of 1917 certain executive orders were promulgated by the President of the United States and the Fuel Administrator, under authority of a war measure enacted by Congress fixing a scale of prices for bituminous coal at the mines. The order of October 27, 1917, permitted an increase in price of 45 cents per ton over that formerly fixed, subject to two conditions:

"*First*: Increase in price to not apply to any coal sold at the mines under an existing contract containing a provision for an increase in the price of coal thereunder in case of an increase of wages paid to miners; and

"*Second*: That the increase in price should not apply in any district in which the operators and miners failed to agree upon a penalty provision satisfactory to the Fuel Administrator for the automatic collection of fines in the spirit of the agreement entered into between the operators and miners at Washington, October 6, 1917."

Between November 1, 1917, and July 1, 1918, defendant coal company mined and sold from the leased land 644,-936 2/3 tons of coal at an increased price of 45 cents for

each ton, and, before paying royalty thereon, deducted from the gross amount for which this tonnage was sold 45 cents per ton, equal to $290,221.50 and refused to pay royalty thereon, claiming that this 45 cents per ton increase composed no part of the price for which the coal was sold, within the meaning of the terms of the lease, but constituted a fund for the payment of its miners, in which defendant has no beneficial interest. Plaintiffs claimed one tenth of this amount, $29,022.15, under the terms of the royalty provision of the lease, and thus arises the first issue.

The second claim of plaintiffs arises in this manner: From July 1916, to July 1, 1918, defendant coal company sold its coal through an agent, the Wyatt Coal Company. In computing royalties upon coal mined and sold it would deduct from the sales price the commissions paid by it to its selling agent, and account to plaintiffs for royalties upon the gross sum received less these commissions paid for selling its coal. Plaintiffs claim that this deduction of selling commissions was improper; and it was stipulated by the parties that in the event of a recovery by plaintiffs against defendant for this claim, the principal amount should be $17,549.29.

Plaintiffs requested payment of the claim of $29,022.15; defendant refused payment, demanded an arbitration, and appointed an arbitrator, giving notice of the appointment. Plaintiffs refused to arbitrate or appoint an arbitrator and gave notice to defendant that they revoked the arbitration clause in the lease, and would institute a suit at law to settle the difference. Defendant then appointed another arbitrator, A. J. King, (having already appointed W. E. Deegans) and these two selected J. W. Dawson as umpire. The arbitrators and umpire gave notice of the time and place of their sitting, met in pursuance thereof, heard evidence of defendant, and made an award to the effect that defendant was not liable for any of plaintiff's claim. Plaintiffs declined to participate in the arbitration, revoked the powers of the arbitrators and so notified them as soon as they were nominated, and, before the award was made, had instituted this suit to assert their $29,022.15 claim, process in which was served on defendant on August 1, 1918. The award

was made and signed November 7, 1918. Prior thereto, about August 20, 1918, notice was served on the arbitrators and umpire and on defendant by plaintiffs, revoking the authority of the arbitrators and umpire to make arbitration of any question relating to payment of royalties under the lease, and declination of plaintiffs to participate in the arbitration or to be bound by the award. Notice that a suit had been instituted for the purpose of determining the matters in difference was also served on defendant by plaintiffs.

At October rules, 1918, plaintiffs filed their amended declaration setting up their claim for $17,549.29 on account of deduction of commissions of the sales agent from the price at which the coal was sold to the consumer before royalties were computed thereon. Defendant thereupon demanded arbitration upon this claim, but plaintiffs declined to arbitrate, and no arbitration was had.

To the first claim defendant pleaded non-assumpsit and the award; and to the second, non-assumpsit and accord and satisfaction. The facts were stipulated, the issues submitted to the court in lieu of a jury, and upon the first claim, $29,022.15, the court found for defendant; and upon the second claim, $17,549.29, found for plaintiffs and entered judgment thereon, with interest, in the sum of $20,496.01. From this judgment plaintiffs obtained this writ of error, and defendant assigns cross-error upon the judgment against it on the second claim.

Logically, the first question presented is whether the award is binding upon the parties as to the claim of $29,022.15. If so, it presents a complete defense to that item.

We are committed in this State to the rule firmly fixed at common law that an agreement to arbitrate is revocable at any time before an award. *Kinney* v. *B. & O. Assn.,* 35 W. Va. 385; *Turner* v. *Stewart,* 51 W. Va. 493; *Lawson* v. *Williamson,* 61 W. Va. 669; *Flavelle* v. *Red Jacket Coal Co.,* 82 W. Va. 295. Where the contracting parties have stipulated that an award shall be final as to the sum to be paid upon a breach of some provision of the contract, but not as to the question of general liability, the stipulation is valid; and if it be agreed that the award fixing the amount be final, and

that no suit shall be instituted until after an award is made, the award must be made before suit is begun; it is a condition precedent. But unless arbitration is made a condition precedent to suit, either by express terms or by necessary implication, it cannot bar suit. Such is the weight of authority. "When the arbitration clause is not made a condition precedent by express words or necessary implication, it will be construed as merely collateral to the liability clause and so no bar to an action in the courts without an award." 2 R. C. L. p. 362, sec. 12 and cases cited.

Some courts have held that a submission to arbitration may be revoked by either party at any time before award is made and published, notwithstanding an agreement not to revoke. *Heritage* v. *State*, 43 Ind. App. 596; *Sartwell* v. *Sowles*, 72 Vt. 270. The theory in these cases is that submissions to arbitration are revocable in their nature, and the parties cannot make that irrevocable which is of its own nature revocable.

But it is argued by defendant's counsel that the arbitration clause in the lease is irrevocable, because upon the failure of one of the parties to appoint an arbitrator upon request for arbitration, the other party is empowered to select both arbitrators and proceed to an award; that neither party intended that this provision for arbitration should be revoked at will, and adopted this method to force an award, not dependent upon a subsequent change in the mind of the other; therefore such a covenant is not revocable at the pleasure of either. It is argued that the right to revoke at common law, and under the modern cases, is based on the power of either party to defeat arbitration by refusing to provide the arbitrators to carry it out. We find that this same contention was made in *Dickson Mfg. Co.* v. *Am. Locomotive Co.*, 119 Fed. 488. The court there held that a provision in an arbitration clause to the effect that failure of either party to appoint an arbitrator shall authorize the other to make an appointment for the one in default does not prevent a revocation of the agreement for arbitration. Where there is an agreement in the submission that the arbitrators may proceed ex parte if either party fails to appear, this does not

render the submission irrevocable. *Boston & L. R. Corp.* v. *Nashua & L. R. Corp.,* 139 Mass. 463, citing *March* v. *Bulteel,* 106 English Reports, p. 1276. There is no provision in the arbitration clause under consideration that arbitration shall be a condition precedent to the institution of suit. The obligation to pay royalties is fixed and the amount definite. The arbitration clause is general in its terms and relates to all disputes between the parties. We can see nothing in the arbitration clause which by implication would make it irrevocable prior to award, or a condition precedent to suit. The policy of the common law has not been changed by our statute except where the parties have agreed that the arbitration is to be made a rule of court.

Should royalties be computed upon the 45 cents per ton added to the selling price as a result of the order of the Fuel Administrator? The plain terms of the lease are that whenever the selling price exceeds 90 cents per ton f. o. b. cars at the tipple, then the lessors shall receive 10 per cent. of the price in excess of 90 cents. It is argued on behalf of defendant that the true intent and meaning is that whenever the coal sold above 90 cents, such excess would be considered as so much clear profit to the lessee and in that event the lessor was to receive one tenth of this clear profit. This construction would place upon plaintiffs the ordinary risks of the business which they clearly did not assume. If a community of profits governed, the relation would be in the nature of a partnership. Plaintiffs did not rely upon the defendant for careful and economic conduct of its business. They have no voice or control in its policies. They were not concerned with the salaries of its officers and the wages of its employees. Whether the business was operated at a loss or profit was of no moment to them, except the laudable concern of a landlord for the success of the tenant. If the price of labor decreased and a consequent larger margin of profit resulted to the lessee if the price of coal to the consumer remained less than 90 cents per ton, it was not contemplated that lessors should participate in that profit; and conversely, if wages increased and the price of coal remained stationary, they would not participate in the consequent

losses. The lease fixes a definite, simple and certain method of computing the royalty, based on the selling price to the consumer, without reference to losses, profits, expenses, wages or any other element which might enter into the production. It is elementary that when a written agreement is clear and unequivocal in its terms, its meaning must be determined by its contents alone, and the courts will not give it a meaning other than that clearly expressed. It is argued that the orders of the fuel administrator forced an increase in the price of coal in order to raise the wages of the miners, and that defendant had no beneficial interest in the increased price, was a mere trustee for the miners in the collection of their advanced wages paid by the consumer, and that it would not be within the spirit of the lease for the landlord to reap any benefit therefrom. We can see no difference between a voluntary increase and an involuntary increase of wages, so far as the right of the lessors to the benefit of their contract is concerned. If the miners had forced an increase by going on a strike, the result would have been the same. Moreover, the order of the Fuel Administrator was permissive only and did not in terms compel either an advance in price or wages. So far as the record discloses the action of defendant in advancing its price by 45 cents per ton was voluntary, and no doubt was founded upon good business reasons from which it derived substantial profits. There was evidently an enormous increase in its production, thus lessening the per cent. of overhead expense. We can see very little application, to the question under consideration, of the case of *Leschen & Sons Rope Co.* v *Mayflower Gold Mining Co.,* 173 Fed. 855, and *American Bonding Co.* v. *Pueblo Inv. Co.,* 150 Fed. 17. In the first case, the last payment ($4,200.00) for goods purchased was "to be paid by buyer's note at 60 days, not later than 60 days from arrival of the last shipment". Title to the goods was retained in the vendor with right to take back the goods "in default of last payment being made". The vendee executed the note at 60 days but failed to pay it when due. An action of replevin was dismissed by the trial court on the ground that the last payment was to be made by note, which was given, and therefore the title to the goods

passed to the vendee. The appellate court reversed the decision, holding that the language "payment by note" would not be construed as a payment of the debt so as to defeat the seller's lien, in the absence of language clearly to the contrary. It held that the note did not discharge the debt until paid, and therefore did not annul the vendor's reservation of title to secure payment. In *American Bonding Co.* v. *Pueblo,* the tenants by a written lease agreed to put into the premises a heating plant, to renew the plumbing, to make other improvements, to pay taxes, etc., in lieu of rent, and to give a bond conditioned for their performance of the contract, and to pay for the work and material used in the improvements to the end that no liens should be fastened upon the property by their creditors. Bond with surety was given, conditioned that they would perform all the obligations assumed by them in the lease, but this bond contained no additional provision that they would pay for the work and material. Lessees installed heating plant and plumbing but did not pay therefor, and lessor paid contractor to relieve liens. Held: There was an express agreement of lessees and surety, evidenced by the lease and bond that lessee would not only install the heating plant and plumbing but that he would pay for the work and material employed therein.

Somewhat applicable to the question here is the case of *Columbus Ry. & Power Co.* v. *City of Columbus,* 249 U. S. 399. The Columbus Railway, Power and Light Co. obtained certain franchises from the city which, under the laws of Ohio, were held as binding contracts, and which required the grantees to furnish street railway service for a designated period at specified rates, in return for use of the streets. Various effects of the world war, particularly an award of the War Labor Board raising the wages of the employees of the company about 50%, wrought a serious and unforseen change in conditions, making the rates under the franchise contract grossly inadequate, but it did not appear that performance was thus rendered impossible, or that the contract as a whole, extending over the entire term of 25 years would prove unremunerative. The Supreme Court held that there was no *vis major* excusing their performance and that the enforce-

·ment of the rates would not deprive the company of property without due process of law. In the opinion Mr. Justice Day said: ''It is undoubtedly true that the breaking out of the World War was not contemplated, nor was the subsequent action of the War Labor Board within the purview of the parties when the contract was made. That there might be a rise in the cost of labor, and that the contract might at some part of the period covered become unprofitable by reason of strikes or the necessity for higher wages might reasonably have been within their contemplation when the contract was made and provisions made accordingly. There is no showing in the ·bill that the War or the award of the War Labor Board necessarily prevented the performance of the contract. Indeed, as we have said, there is no showing, as in the nature of things there cannot be, that the performance of the contract, taking all the years of the term together, will prove unremunerative. We are unable to find here the intervention of that superior force which ends the obligation of a valid contract by preventing its performance. It may be, and taking the allegations of the bill to be true, it undoubtedly is, a case of a hard bargain. But equity does not relieve from hard bargains simply because they are such. It may be that the efficiency of the service and fairness in dealing with the Company which performs such important and necessary service ought to require an advance in rates; such was the strongly announced opinion of the War Labor Board. But these and kindred considerations address themselves to the duly constituted authorities having the control of the subject-matter.'' Other cases are cited in the opinion which are relevant.

We think the plain and unambiguous terms relating to the payment of royalties based upon the sale price to the consumer is not susceptible of interpretation. The payment of these royalties on this fixed basis is not affected by the expenses of mining or selling the coal, however brought about or incurred.

The trial court erred in not including in its judgment for the plaintiff the item of $29,022.15, with interest, being 4½

cents per ton on 110,278.19 tons mined and sold in the months of November and December, 1917, and 534,658.34 tons mined and sold in January, February, March, April, May and June of 1918.

From what we have said it follows that the trial court properly rendered judgment for the claim of $17,549.29 with interest. It is sufficient to say that the commissions paid by defendant to its selling agent for marketing its coal is one of the expenses of the operation. Rather than expend energy, money and time in the selling of its product it employed an agent for that purpose. It carried on a necessary part of its business in this manner, and the commissions paid its agent are as much a part of the expense in the conduct of its business as the salary of its general manager, or if its mine foremen in the operating department, so far as the contract for the payment of royalties is concerned. But by special plea No. 2 defendant says that it has paid plaintiff $367,911.75 which was accepted by it in full satisfaction and discharge of the claims sued for. In support of this plea it is shown that defendants for the first six months period of the lease, July 1, 1916, to January 1, 1917, paid to plaintiff's predecessors in title, Cole and Crane $33,863.44, which included the regular and excess royalties with a statement of the account, and for each of the other six months periods extending to July 1, 1918, the said regular and excess royalties were paid with vouchers accompanied by statements of the accounts; for the period between January 1, 1917, to July 1, 1917, $57,653.04; July 1, 1917, to January 1, 1918, $34,089.82; and from January 1, 1918, to July 1, 1918, the final sum of $99,223.60. While this last payment was tendered in full of the account as stated in the voucher, it was accepted by plaintiffs with defendant's consent that it should not prejudice the rights of plaintiffs in this suit. The vouchers and statements accompanying them are in the record. Each time a payment was made a statement was furnished showing tonnage mined and sold, the price received, the regular and excess royalties, which payment was accepted by plaintiffs, the checks being endorsed and cashed, without complaint or comment, except as to the last payment, which on

its face read, "in full payment of account as shown on re-
verse side of this voucher." As above stated, this voucher
was accepted without prejudice to the pending suit. Neither
the vouchers nor the statements show that the commissions
paid to the selling agent had been deducted from the price
at which the coal was sold. But it is argued that plaintiffs
and their predecessors in title were familiar with all the facts
in these settlements, for it is stipulated that Clinton Crane,
one of the lessors, was a stockholder and director in defend-
ant company until May, 1917, and had constructive notice
of the fact that the commissions of the selling agent had been
deducted before calculation of royalties; that following his
death he was promptly succeeded as director by Kohlsaat,
one of the plaintiffs, and, in the early part of 1917, the other
plaintiffs became members of the directorate, and are still
directors; that R. F. Carson, the mining engineer of plaintiff,
was also a director from March, 1917, until March, 1918,
and was general manager of the company from May 1, 1917,
to October 1, 1917. The selling agent during the period
ending April 1, 1918, at the beginning of each month, re-
ported to defendant company for the preceding month the
sales of coal including the aggregate price paid and its com-
missions deducted, and other data, which reports were filed
and preserved with defendant's records and papers. The
contract with the selling agent ended April 1, 1918, at which
time defendant organized its own sales department, which
make like reports of its sales, and deducted commissions, and
calculated royalties on the net amount remaining. It is
on these facts that defendant bases its argument that plain-
tiffs, and their predecessors in title, had actual and construc-
tive notice of the deductions of selling commissions from the
price of coal paid by the consumer before calculation of
royalties, and accepted the royalties so calculated without
objection or exception, and therefore waived the provision in
the lease contract that the royalties were to be calculated on
the price which the consumer paid.

There is no question that under the contract plaintiffs are
entitled to its royalties based on the price of the coal paid
by the consumer. It is a mere matter of calculation, after

the price and number of tons sold shall have been ascer-
tained. By accepting royalties accompanied by statements
as above set out, has it waived its contract and agreed that
selling commissions shall be first deducted and its royalties
calculated on the remaining sum? Does the acceptance of a
sum less than that actually owed release the debtor from
the balance in the absence of an express agreement, or com-
promise settlement for that purpose? It will be observed
that none of the royalty statements furnished plaintiffs and
which accompanied checks in payment, show on their face
that selling commissions had been deducted. Plaintiffs deny
any actual notice or information that such commissions were
being deducted to their detriment, and as soon as it became
known to them they immediately began to investigate to as-
certain if it was true, and to ascertain the amount of com-
missions deducted by the selling agent during the life of its
selling contract. This was in September, 1918. There was
no dispute or disagreement at any time about the liability
of defendant for royalties upon these commissions, and hence
no compromise, or full satisfaction of a disputed claim in any
of these payments. There must be a controversy or dispute
before there can be any subject of compromise. No actual
notice that the deduction of these commissions lessened the
royalties is shown to have been received by plaintiff, nor is
there anything in the minutes of the directors' meeting to
show that such deductions, before payment of royalties, was
ever discussed, considered or acted upon. Even if we can
say that the statements and vouchers, upon careful inspection
and analysis, would have disclosed to plaintiffs payment of a
lesser amount of royalties than they were entitled to receive
under their contract, thus bringing to them actual notice, and
they accepted the vouchers, there is nothing to indicate that
they were accepted in full discharge of the indebtedness.
This would have changed the plain terms of the contract with-
out any consideration. *Nixon* v. *Kiddy*, 66 W. Va. 355.
The principle of law governing is stated tersely in *Nixon* v.
*Kiddy* as follows. "Payment by a debtor and receipt by
the creditor of a less sum than is due upon an undisputed
liquidated demand is not satisfaction of the debt, although

the creditor agrees to accept it as such, if there be no release under seal or no new consideration given as to the part left unpaid." And, "if a debtor gives to his creditor a check for a part of an undisputed liquidated sum, reciting in the check that it is in full of the debt, the acceptance and use of the check by the creditor does not discharge the entire debt in the absence of a consideration for the release of the unpaid part." See 1 Cyc. 319; *Fire Ins. Co.* v. *Wickham,* 141 U. S. 564. "Payment by a debtor of a part of his debt is not a satisfaction of the whole, except it be made and accepted upon some new consideration." *U. S.* v. *Bostwick,* 94 U. S. 53, 67. This principle of law is too well established to require citation of many authorities. However, it is not clear that either plaintiffs or their predecessors in title had either actual or constructive notice that they were being paid less than their royalties to which they were entitled under the lease, and it is clear that when plaintiffs by investigation became convinced that such had been done and was being done, they promptly made complaint and amended their declaration so as to recover this newly discovered claim.

The contention that the payments accompanied by the statements constituted an account stated and paid, thus precluding suit, is untenable. As before pointed out, the statements and vouchers did not show the deductions made for commissions, and defendant did not so consider its payments as final, because in several subsequent statements it deducts items due it which had been omitted from previous settlements. Furthermore, an account stated can always be corrected by showing mistake. C. J. p. 709. Where there is an account stated between the parties, and intended to be such, it affords strong presumptive evidence of settlement, which may be rebutted by showing fraud or mistake. *Harman* v. *Crockett,* 57 W. Va. 66; *McNeel* v. *Baker,* 6 W. Va. 153; *Townes* v. *Birchett,* 12 Leigh 173.

On January 24, 1919, after the institution of the suit, defendant demanded of plaintiffs an arbitration of the controversy concerning plaintiffs' claim of $17,549.29, which arbitration was declined and refused by plaintiffs and then no steps further were taken in that regard, and no award

made. It is insisted that the arbitration clause made an award a condition precedent to the institution of a suit on this claim, the "self acting" feature therein being relied upon as constituting an exception to the general rule at common law followed in this State and hereinbefore stated. What we have said relative to the arbitration and award of the claim of $29,022.15 applies with equal force to the demand and refusal of arbitration of this claim. In addition to the cases before cited the following authorities bear out the conclusion that the "self acting" feature does not prevent revocation before an award, and is not a condition precedent to suit. *U. S. Asphalt Refining Co.* v. *Trinidad,* 222 Fed. 1006; *Harton* v. *Sayre,* 4 H. & N. 642. See also note in 47 L. R. A. (N. S.) 441.

The trial court did not err in finding for plaintiffs on their claim for $17,549.29, with interest to and from date of judgment.

We hereby modify the judgment of the circuit court of Logan County, entered on the 16th day of July, 1920, so as to include therein the item of $29,022.15, with interest thereon from the 1st day of July, 1918; and strike out in its entirety the last clause of said judgment order beginning with the figure "3", followed immediately by the words "The court further finds that the plaintiffs are not entitled to recover" etc.; and insert in the place and stead thereof the following: 3. The Court further finds that the plaintiffs are entitled to recover from the defendant the item of $29,022.15, with interest thereon from the 1st day of July, 1918, now amounting to the sum of $32,577.35 (principal and interest), the principal sum being $4\frac{1}{2}$ cents per ton on 110,278.19 tons mined from the leased premises during the months of November and December, 1917, and 534,658.38 tons mined from the leased premises in January, February, March, April, May and June, 1918, the $4\frac{1}{2}$ cents per ton being 10% of 45 cents which the United States Fuel Administrator authorized to be added to the then selling price of coal on condition that a like sum per ton be added to the wages of its miners, and which condition was performed by defendant.

It is therefore considered by the Court that the plaintiffs recover of and from the defendant the sum of $53,073.36 (being the two said sums of $20,496.01 and $32,577.35) with legal interest thereon from this day (July 16, 1920) until paid, together with their costs about the prosecution of this action in that behalf expended, including a statute fee of $10.00.                                    *Modified and affirmed.*