THE BOARD OF EDUCATION OF COUNTY OF BERKELEY

*v.*

W. HARLEY MILLER, INC.

(No. 13608)

Decided November 18, 1975.

*Rice, Hannis & Douglas, Lacy I. Rice, Jr., and Charles F. Printz, Jr.,* for appellant.

*Robert M. Steptoe, Herbert G. Underwood* for appellee.

HADEN, CHIEF JUSTICE:

This is an appeal from an order of the Circuit Court of Berkeley County in which that court refused to dissolve a preliminary injunction obtained by appellee, The

Berkeley County Board of Education, against the appellant, W. Harley Miller, Inc. *See, W. Va. Code* 1931, 58-5-1(g). The injunction was issued to restrain the appellant from invoking and proceeding with arbitration procedures, provided in a construction contract between the parties, pending the outcome of a declaratory judgment action. The Board of Education commenced the civil action against Miller to seek a judicial resolution of a dispute involving rock excavation incident to the construction project and to block Miller's efforts to resolve the conflict by arbitration.

Miller, a contractor in Berkeley County, entered into a general contract with the Board of Education on December 30, 1974, for the construction of a new school known as North Berkeley High School. The contract documents incorporated Specifications dated November 15, 1974. A dispute arose over removal of an unanticipated quantity of rock by Miller's subcontractor, Heiden, Inc. The contract called for the architect to compute the rock in place before removal. On February 21, 1975, based upon work performed by Heiden to that date, Miller submitted to the architect a demand for $410,160.00 based upon the aggregate removal of 25,635 cubic yards of rock computed at the rate of $16.00 per cubic yard. The Board of Education immediately complained that its architect had not been notified nor given an opportunity to measure the rock in place. The architect then directed Miller to terminate excavation until he could ascertain the rock in place. After measuring the rock in place, the architect determined that there remained only 6,573 cubic yards to be excavated; and consequently, that Miller was entitled to a pay order of $105,168.00 for rock removal. Accordingly, Miller's claim for $304,992.00 remains outstanding and unresolved.

Miller seasonably demanded that the dispute be submitted to arbitration in accordance with Paragraph 7.10.1 of the Specifications, which comprises what is known as a standard arbitration clause.

On March 21, 1975, Miller filed a Demand For Arbitration on a form provided by the American Arbitration Association. On April 2, 1975, the Board of Education rejected Miller's Demand For Arbitration and filed this litigation to enjoin Miller from proceeding with its demand to settle the dispute by arbitration and to seek a judicial declaration. Following a hearing on this matter before the Circuit Court of Berkeley County on April 23, 1975, the circuit court granted the assailed injunction, basing its decision on *Hughes v. National Fuel Co.*, 121 W. Va. 392, 3 S.E.2d 621 (1939).

Miller submits that the sole issue in this proceeding is whether, under the laws of the State of West Virginia, a party to a contract which contains a standard arbitration clause, has the right to reject a demand for arbitration by the other party to the contract up to the time of an award, or does such contract, by the execution thereof, compel submission to arbitration by right of mutual promise. The Board, on the other hand, asserts that the only issue raised is whether a party to an executory contract has the right to demand enforcement of an agreement to arbitrate a future difference between the parties. Perhaps a less conclusory description of the issue is, simply, whether the parties have a contractual obligation to submit the dispute to arbitration before either may resort to court action.

The use of arbitration as a mechanism for settling contractual disputes was permitted at common law and even favored because of its potential to terminate controversies speedily and cheaply. At common law, however, any agreement to submit to arbitration was merely voidable. In other words, as a general rule, a party could revoke its promise to submit to arbitration at any time before award. *Hughes v. National Fuel Co., supra.* As explained in *Riley v. Jarvis*, 43 W. Va. 43, 26 S.E. 366 (1896):

> "The reason why the agreement was revocable under common-law was, not that arbitration was not favored by it as tending to end litigation, and

not for want of consideration, as the ending of litigation was strong consideration, but because of that principle of law that parties could not, by agreement, oust the courts of their jurisdiction assigned them by law, and could not debar themselves from appealing to the law and tribunals of the land; . . . . " *Id.* at 48.

The *Riley* Court went on to explain that the judicial apprehensions that courts would lose jurisdiction to arbitrators were, if not eliminated, lessened measurably by the enactment of statutes—specifically, *W. Va. Code* 1931, 55-10-1 and 55-10-2, which legitimated arbitration agreements. *Id.* Such statutes, however, have been construed to be merely supplementary to the common law. Consequently, statutory arbitration in West Virginia is not to be considered as having supplanted common-law arbitration. *Hughes v. National Fuel Co., supra; Columbian Fuel Corp. v. Warfield Natural Gas Co.,* 72 F. Supp. 839 (S.D. W. Va. 1947).

*W. Va. Code* 1931, 55-10-1 and 55-10-2 provide in pertinent part:

> "Persons desiring to end any controversy, whether there be a suit pending therefor or not, may submit the same to arbitration, and agree that such submission may be entered of record in any court . . . . "

> . . .

> "No such submission, entered or agreed to be entered of record, in any court, shall be revocable by any party to such submission, without the leave of such court; . . . . "

*See, Stiringer v. Toy,* 33 W. Va. 86, 10 S.E.26 (1889). The language, "[p]ersons desiring to end any controversy," employed in the opening sentence in *W. Va. Code* 1931, 55-10-1, appears to imply that the provision applies only to existing controversies and furnishes a basis for the conclusion that the statutory remedy merely supplements the common law. This co-existence of viable statutory and common-law principles regarding the same subject matter, seemingly, is responsible for the rule

124

fashioned in *Turner v. Stewart*, 51 W. Va. 493, 41 S.E. 924 (1902). Respecting statutory law in the first sentence and the common law in the next one, the Court held that:

> "A submission to arbitration of an existing controversy entered in court, or by agreement out of court providing that the award shall be entered as the judgment or decree of the court, is not revocable, except by the court, and will bar a suit upon the demand submitted. But a provision in a contract that any future controversy under it shall be arbitrated will not prevent an action." *Syllabus* point 3., *id.*

A similar common-law rule was recognized earlier in *Kinney v. Balt. & Ohio Emp. Rel. Ass'n.*, 35 W. Va. 385 (1891), which stated:

> "A provision in a contract that all differences arising under it shall be submitted to arbitrators, thereafter to be chosen, will not prevent a party from maintaining a suit, in the first instance, in a court to enforce his rights under it." *Syllabus* point 1., *id.*

Yet, the *Kinney* Court also recognized an exception to the foregoing principle, which was fashioned in an older Virginia case, *Condon v. South Side Railroad Co.*, 55 Va. (14 Gratt.) 302 (1858). This common-law exception provides that an agreement to arbitrate future controversies is not revocable where it has been made a condition precedent to a right of action. By the following quote, the *Condon* Court explained the compatibility of this exception with the general common-law rule:

> "[P]arties by their contract may lawfully make the decision of arbitrators or of any third person a condition precedent to a right of action upon the contract. In that case such decision is a part of the cause of action. Until the decision is made and the cause of action thus becomes complete, the courts have no jurisdiction of the case, and therefore cannot be said to be ousted of their jurisdiction by the contract." *Id.* at 314.

In its conclusion, the *Condon* Court quoted from what at that time was a recent case, *Scott v. Avery*, 36 Eng. L. & E.R. 1, 15 (1856), which noted " 'a safe distinction between an agreement which would close entirely the access to the courts of law, and that which only imposes, as a condition precedent to the appeal to them, that the parties shall have first settled, by an agreed on mode, the precise amount to be recovered there.' " *Id.* at 316.

This Court has applied the exception several times since *Kinney*. *See, Lawson v. Williamson Coal & Coke Co.*, 61 W. Va. 669, 57 S.E. 258 (1907); *Moore v. Hope Natural Gas Co.*, 76 W. Va. 649, 86 S.E. 564 (1915); *Flavelle v. Red Jacket Con. Coal & Coke Co.*, 82 W. Va. 295, 96 S.E. 600 (1918); *Kohlsaat v. Main Island Creek Coal Co.*, 90 W. Va. 656, 112 S.E. 213 (1922); *Pettus v. Olga Coal Co.*, 137 W. Va. 492, 72 S.E.2d 881 (1952); *Browder v. County Court*, 143 W. Va. 406, 102 S.E.2d 425 (1958). Pertinent to the present case, in applying this exception in *Pettus v. Olga Coal Co., supra*, this Court adopted a broad rule which greatly diminished the scope of the old common-law right to revoke agreements to arbitrate future disputes. In *Pettus*, the Court held that:

> "A contract providing a procedure for arbitration of disputes, and providing that 'all claims, demands or actions growing therefrom or involved therein shall be by the contracting parties settled and determined exclusively by the machinery provided in the' contract, creates a condition precedent to any right of action or suit arising under the contract." *Syllabus* point 3., *id.*

Holding that this language created a condition precedent to the right of the parties to sue, the Court observed that a condition precedent may arise not only by express language but by necessary implication in the arbitration provision. *Id.* at 499-500.

The language differences in the arbitration clauses in *Pettus* and in the present case are minor and insignificant. The provision in this case states in pertinent part:

> "All claims, disputes and other matters in question arising out of, or relating to this Contract or the breach thereof, ... shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof." ¶7.10.1 of Specifications.

As the Court found the word, "exclusively," to be significant in *Pettus*, this Court is of the opinion that the phrases, "shall be decided by arbitration" and "shall be specifically enforceable" are crucial. Such language renders proceeding by arbitration mandatory, thereby precluding any right of action until the procedure has been completed.

Although *Pettus* would appear to be in direct conflict with the *Kinney* and *Turner* cases, which restated the old common-law rule, this Court is of the opinion that the *Pettus* application of the *Condon* exception to the common-law rule is valid. The rationale supporting the common-law rule, *i.e.* to prevent parties by agreement from ousting courts of jurisdiction, is frankly archaic. It is elementary that arbitration agreements are highly favored today in many areas of law. As the *Condon* decision indicates, such agreements also were recognized and enforced by the Mother Commonwealth before the creation of this State. The desire for quick and efficient determinations of disputes between contracting parties, which arbitration generally encourages, has gradually replaced judges' overweening concern for preserving courts' of their jurisdiction.

This Court's continued adherence to, and reliance upon, the common-law exception was prompted and is necessitated because the statutory arbitration procedures are inadequate. In failing to supplant the obsolete

common-law principle, which regards arbitration as a remedy rather than as a substantive right, *W. Va. Code* 1931, 55-10-1 *et seq.* inhibits rather than encourages the arbitration mechanism. It would appear that a modern and comprehensive statute on the subject of arbitration is sorely needed. The wisdom of the Legislature should be employed to insure that standard arbitration clauses in commercial contracts, fairly consented to by the parties, be enforceable, whether the disputes covered thereunder be of present existence or of future contemplation.

Thus, this Court holds that the Berkeley County Board of Education is obligated by its contract with Miller to submit their dispute over rock excavation to arbitration.

The order of the Circuit Court of Berkeley County is reversed and the cause is remanded with directions to dissolve the preliminary injunction and abate the action so as to allow the instant controversy to go to arbitration, as previously agreed by the parties.

*Reversed and remanded.*

BERRY, JUSTICE, *dissenting:*

I respectfully dissent from the majority on the sole ground that, in my opinion, there is no language in the contract either expressed or implied that would make the procedure for arbitration a condition precedent to any right of action arising out of the contract. I agree that there is an exception to the common law rule relating to contract arbitration that if arbitration is made a condition precedent to any right of action the arbitration agreement cannot be revoked or rejected by the contracting parties. *Pettus v. Olga Coal Co.*, 137 W. Va. 492, 72 S.E.2d 881 (1952); *Lawson v. Williamson Coal and Coke Co.*, 61 W. Va. 669, 57 S.E. 258 (1907).

The majority relies on *Pettus* to bring the case at bar within the condition precedent rule. In that case, the contract for arbitration contained specific language which made all disputes between the parties to the con-

tract subject to settlement *exclusively* by the provision for arbitration. Quite a different situation is presented by the agreement in the present case. The majority relies on the phrases "shall be decided by arbitration" and "shall be specifically enforceable" to support its conclusion that arbitration is a condition precedent to an action by implication from the terms of the contract between Miller and the Board of Education. Very similar if not identical words have been both expressly and tacitly held not to bring an arbitration clause within the condition precedent rule by implication. *See, e.g., Hughes v. National Fuel Co.,* 121 W. Va. 392, 3 S.E.2d 621 (1939); *Kohlsaat v. Main Island Creek Coal Co.,* 90 W. Va. 656, 112 S.E. 213 (1922); *Flavelle v. Coal & Coke Co.,* 82 W. Va. 295, 96 S.E. 600 (1918); *Turner v. Stewart,* 51 W. Va. 493, 41 S.E. 924 (1902); *Kinney v. B & O Emp. Rel. Ass'n.,* 35 W. Va. 385, 14 S.E. 8 (1891).

The result of this Court's decision today is to permit the exception to swallow the rule. As a practical matter, common law principles relating to contract arbitration have been so emasculated as to render them inapplicable to the vast majority of situations. Because I believe that this Court is "sternly and unmistakably enjoined to leave drastic changes in the common law to the legislative branch of state government" by the mandate of Article VIII, Section 21 of our *Constitution, Cunningham v. County Court,* 148 W. Va. 303, 134 S.E.2d 725 (1964), I would affirm the judgment of the Circuit Court of Berkeley County.

NEELY, JUSTICE, *concurring:*

I must concur because the majority has not clearly abolished archaic rules regarding arbitration which are passé and ineffective. The majority opinion traces the history of arbitration and reaches the correct result, but in doing so obfuscates rather than overrules a century's collected confusion. The majority opinion does not clearly further a policy of conflict resolution, although I believe that that is the intent of the decision.

Arbitration as a means of conflict resolution appeared in West Virginia case law as early as 1867. *Boring v. Boring*, 2 W. Va. 297 (1867). The common law favored arbitration as an effective procedure for the resolution of controversies because arbitration was simpler, faster, and cheaper than courts. *Mathews v. Miller*, 25 W. Va. 817 (1885). At common law,[1] however, under a principle first enunciated by Lord Coke in 1609,[2] either party could revoke his agreement to arbitrate at any time before the award. The oft-stated justification for this principle, namely that parties cannot by agreement oust the courts of their jurisdiction, was not established until 1746.[3] Anyone sensitive to the judicial decision making process must infer that this doctrine arose through hard cases making bad law.

The 1870 *Code of West Virginia* contained a statutory provision for arbitration which is substantially the same statute which we find in our present *Code*. The 1870 *Code* read at Chapter 108 as follows:

> "1. Persons desiring to end any controversy, whether there be a suit pending therefore or not, may submit the same to arbitration, and agree that such submission may be entered of record in any court. Upon proof of such agreement out of court, or by consent of the parties given in court, in person or by counsel, it shall be entered in the proceedings of such court; and thereupon a rule shall be made in pursuance of such agreement.

> "2. No such submission, entered, or agreed to be entered, of record in any court, shall be revo-

---

[1]For a very interesting article on the historical origins of arbitration, see, E. Wolaver, "The Historical Background of Commercial Arbitration," 83 U. of Pa. L. Rev. 132 (1934).

[2]*Vynoir's Case*, 4 Coke 299 (1609); the English have all but erased this precedent, but its influence lingers strongly in this Country. *See* "The Paradox in Arbitration Law: Compulsion as Applied to a Voluntary Proceeding," 46 *Harv. L. Rev.* 1258 (1933).

[3]*Kill v. Hollister*, 1 Wilson 129 (K.B. 1746).

cable by any party to such submission, without the leave of such court; and such court may, from time to time, enlarge the term within which an award is required to be made."

This statute was construed by the courts to be supplementary to and not exclusive of common law arbitration. The language "persons desiring to end any controversy" was construed to mean that only existing controversies could be submitted to arbitration under the statute and that parties could not make provision for the arbitration of future conflicts.[4]

Under common law arbitration which permitted parties to withdraw from arbitration any time before an award, the majority cites the exception found in *Condon v. South Side Railroad Co.*, 55 Va. (14 Gratt.) 302 (1858) which allowed that an agreement to arbitrate future controversies may not be revoked if it has been made a condition precedent to a right of action in the courts. The *Condon* opinion, which in 1858 properly conceived the role of courts in reviewing arbitration questions, tacitly recognizes that a court cannot adjudicate a controversy on its own motion; before it can act there must be proper application invoking the judicial power of the court to litigate the matter at issue. The condition precedent exception, then stems from the idea that until a cause of action becomes complete—that is to say, until an issue becomes ripe for review—there is no case or controversy to be resolved. The parties agree in their contract that they will not invoke the jurisdiction of the courts until such time as the arbitrators have ruled on the controversy. The parties are not ousting the courts of their jurisdiction, but are merely postponing the time

---

[4]"A submission to arbitration of an existing controversy entered in court, or by agreement out of court providing that the award shall be entered as the judgment or decree of the court, is not revocable, except by the court, and will bar a suit upon the demand submitted. But a provision in a contract that any future controversy under it shall be arbitrated will not prevent an action." *Turner v. Stewart*, 51 W. Va. 493, 41 S.E. 924 (1902).

when they may take the matter to the courts. Therefore, a court should withhold its jurisdiction until such time as the parties have agreed to invoke that jurisdiction. Under this exception the question remains, however, whether such arbitration is but a ceremony, or whether the court will summarily enter an order enforcing the arbitrator's award. This is by far the most important issue in the entire field of arbitration, and the majority opinion has squarely avoided it.

As the majority opinion points out, the exception involving arbitration as a condition precedent was applied with increasing frequency as the 20th Century progressed. Court dockets were becoming overburdened and the courts began to enforce arbitration agreements as binding. As recently as 1952, this Court expressed its approval of contractual arbitration provisions by upholding an agreement to arbitrate future disputes in *Pettus v. Olga Coal Co.*, 137 W. Va. 492, 72 S.E.2d 881 (1952):

> "A contract providing a procedure for arbitration of disputes, and providing that 'all claims, demands or actions growing therefrom or involved therein shall be by the contracting parties settled and determined exclusively by the machinery provided in the' contract, creates a condition precedent to any right of action or suit arising under the contract." *Id.* at *Syllabus* point 3.

While *Pettus* is less than a clarion call to binding and final arbitration, it does demonstrate the Court's interest in enforcing arbitration agreements made before a controversy arises, as the court permitted the creation of a condition precedent by implication. Similarly in the instant case, the present Court re-emphasizes the interest in enforcing arbitration agreements by interpreting the language of the contract *sub judice* as creating a condition precedent to a right of action. However, what exactly is the nature of this so-called right of action?

The clear direction of this Court as well as the federal courts[5] over this whole century has been toward favoring binding arbitration. If we recognize the advantages of binding arbitration, why do we not overrule all the outdated prior cases[6] and say clearly that parties who undertake to arbitrate must do so, and further that the judgment of the arbitrator cannot be challenged in the courts except for fraud. California has held that parties who voluntarily agree in writing to arbitrate should be bound by the statute and should not be permitted to escape from their contract through the portals of the common law. *Crofoot v. Blair Holding Corp.*, 119 Cal. App.2d 156, 260 P.2d 156 (1953).

Every lawyer understands perfectly that a law suit is a very poor way to resolve conflicts. Regardless of who emerges victorious from the courtroom, everyone loses. The time, effort, and expense of a law suit drains both parties. The trauma can be lessened considerably, however, if arbitration is used to settle the same dispute. As early as 1925, statistics showed that arbitration was inexpensive, convenient for the parties, expeditious, simple to administer, tended to preserve the good will between the disputants, and assured such privacy as the parties desired.[7] Existing common law doctrines circumscribing arbitration have outlived any imagined usefulness in the last century. Unfortunately, because the common law principles have existed for so long, courts

---

[5]The United States Supreme Court recently held that injunctive relief is available under §301 of the *Labor-Management Relations Act,* 29 U.S.C. §185(a) [1970] against strikes in violation of a no-strike clause where the grievance which gave rise to the strike is arbitrable under the agreement. *Boys Market, Inc. v. Retail Clerks, Local 770,* 398 U.S. 235 (1970).

[6]"The common law of England is in force in this State only so far as it is in harmony with its institutions, and its principles applicable to the state of the country and the condition of society." *Powell v. Sims,* 5 W. Va. 1 (1871), at Syl. Pt. 1.

[7]*See* "Commercial Arbitration or Court Application of Common Law Rules of Marketing," 34 *Yale L. J.* 480 (1925).

are reticent to extinguish them in favor of a more sensible and precisely outlined system.

Consequently, in West Virginia, I would overrule the following cases insofar as they promote and protect the common law arbitration doctrine: *Pendleton v. Barton,* 4 W. Va. 496 (1871); *Bean v. Bean,* 25 W. Va. 604 (1885); *Kinney v. Baltimore & Ohio Employees' Relief Ass'n.,* 35 W. Va. 385, 14 S.E. 8 (1891); *Riley v. Jarvis,* 43 W. Va. 43, 26 S.E. 366 (1896); *Turner v. Stewart,* 51 W. Va. 483, 41 S.E. 924 (1902); *Lawson v. Williamson Coal & Coke Co.,* 61 W. Va. 669, 57 S.E. 258 (1907); *Flavelle v. Red Jacket Consol. Coal & Coke Co.,* 82 W. Va. 295, 96 S.E. 600 (1918); *Kohlsaat v. Main Island Creek Coal Co.,* 90 W. Va. 656, 112 S.E. 213 (1922); and *Morrison Dept. Store Co. v. Lewis,* 96 W. Va. 277, 122 S.E. 747 (1924).

Parties should be free to contract for any method of resolving existing or potential conflicts they see fit—and such agreements should be firmly binding and strictly enforced. The only exception which I could foresee would involve contracts of adhesion where there has been a gross disparity of bargaining power between the parties, exclusively as a result of the *monopolistic* or *oligopolistic* position of one of the parties. Furthermore, unless there be a clear showing of manifest fraud, corruption, or clerical error, resort to the courts after submission to arbitration should meet with summary judgment in favor of the award. I hasten to add that fraud and corruption are far different animals from procedural irregularity.

The federal courts have instituted such a system of enforcing arbitration and recognize its advantages. In *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448 1 L.Ed.2d 972, 77S.Ct. 912 (1957), the United States Supreme Court held that federal courts must grant specific performance of collective bargaining agreements to arbitrate. Three years later in the landmark *Steelworkers* trilogy of 1960, the Supreme Court indicated that courts would be closed to the challenge of arbitration awards in most cases. The Court limited the courts' role "to ascer-

taining whether the party seeking arbitration is making a claim which on its face is governed by the contract,"[8] created a strong presumption favoring arbitration in contract disputes,[9] and, finally, held that if the arbitrator's award is based on the relevant agreement, the courts must enforce the agreement and not consider the case *de novo*, regardless of whether the court agrees with the award or even if it finds the award is ambiguous.[10]

Procedures for arbitration can be spelled out in the contract. When such procedures are not spelled out fully the arbitrators should be free to use any procedure they see fit. The scope of agreements to arbitrate should be liberally construed. The parties contract for an arbitrator, not a procedure. Due process does not necessarily mean Anglo-American legal rules of evidence, nor winner-take-all substantive rules. Furthermore, once the parties have agreed to arbitrate, they ought not to be allowed to re-litigate the same issues in the courts. The system of review of arbitration awards should be set up to avoid delay caused by the losing party in arbitration challenging the award of the arbitrators, *especially on mere procedural grounds!* The strict rules governing an action at law have never been applicable to an arbitration proceeding, *Boomer Coal & Coke Co. v. Osenton*, 101 W. Va. 683, 133 S.E. 381 (1926). The parties should know this when they agree to arbitrate, and they should not be heard later to complain on an issue of procedure. Arbitration can, and almost inevitably does, decide the substance of the controversy with substantial justice regardless of procedure.

---

[8]*United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564 (1960).

[9]*United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960).

[10]*United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960).

The argument is often heard that parties frequently are "forced" into arbitration agreements because of unequal bargaining power. Almost all contracts involve unequal bargaining power. The law of contracts of adhesion is rapidly developing and is based on economic realities concerning monopolies and oligopolies. Aside from the exceptions carved out in the contract of adhesion exception, in the United States men are still free to contract and must be bound by their own agreements rather than the conscience of courts. In business affairs it is predictability above all else which is required. It is not the function of the courts to compensate for all the natural and acquired differences among men. Laborers have unions to protect them, corporations have high-priced counsel, professionals should know enough to retain counsel, and laymen in their capacity as mere consumers rarely are engaged in situations calling for arbitration.

The cost of arbitration is considerably less than actions at law, primarily because of the arbitrator's ability to use what in the courts would be called "judicial notice." Judges simply cannot be familiar with the intricacies of every business that comes before them in law suits. Consequently, in order to inform the judge, and the jury, regarding the dispute between parties, a great deal more time is required to put on expert witnesses and general witnesses to testify to mundane facts that must be established before the trier of fact can make a reasoned decision. In an arbitration proceeding, each of the parties selects his own arbitrator, and those selected usually are people familiar with the type of dispute to be presented. That is to say, contractors select contractors, engineers select engineers, laborers select union people, and professionals select other people in their profession. Arbitrators can take "judicial notice" of so many more facts than a court can, such as reasonable standards in the trade or profession, local custom, and trade usage. Consequently, this information need not be presented at the arbitration hearing *ad nauseum* by deposition after deposition, witness after witness, testimony after testi-

mony, and cross-examination after cross-examination, all of which unnecessarily increases the time and expense required in court to come to a reasoned resolution and effect substantial justice.

Implicitly one of the things for which contracting parties covenant in providing for arbitration is finality; that is to say the elimination of the expense and annoyance of appeals. Nothing brings business to a halt or precipitates bankruptcy upon the under-capitalized like litigation. Litigation is always a curse; it is never a blessing except to the iniquitous and the law's delay will always exert pressure upon parties who are both needy and righteous to accept far less than their just entitlement.

It should be self-evident to anyone who has even practiced the least bit of law that common law rules with regard to damages, legal defenses, and evidence do not necessarily promote justice in any individual case—they are merely more just in more cases than any other rules yet devised which must be broadly applied. Most American households are reasonably well run and decision making within the family is reasonably just without anyone ever having heard of the common law. Compromise, consideration for one's fellow man, gentlemanly conduct, and a firm desire to minimize loss for both parties in a dispute are the real qualities which make a reasonable business community. Reluctantly I confess that these values are better served through a wise arbitration than in a court of law.